# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|  |  |  |
|---|---|---|
| KYLE DAWSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-971 |
| | ) | |
| WASHINGTON GAS LIGHT COMPANY, | ) | |
| ET AL. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM OPINION

THIS MATTER comes before the Court on Defendants' Motion
for Summary Judgment (Dkt. 40) pursuant to Federal Rule of Civil
Procedure 56.

Plaintiff is a biracial, part Caucasian, part African-
American, light-skinned man. Plaintiff began working for
Washington Gas Light Company ("WGLC") in 2007. Between the
summer of 2013 and July 24, 2018, Plaintiff worked as a crew
mechanic, crew leader in-training, and crew leader. Plaintiff
also twice participated in the Crew Leader Development Program
("CLDP") with successful completion on the second attempt.

Beginning around the summer of 2013 to fall of the same
year, Plaintiff began to experience what he believed was harsh
treatment from his supervisor, Robert Surdam, in the CLDP.

Plaintiff stated Surdam would yell at Plaintiff while not yelling at other employees in the CLDP. One instance in particular, Plaintiff stated that Surdam yelled at him for not wearing his safety glasses. It is unclear whether Surdam knew that Plaintiff was biracial.

Between October 2013 and the beginning of 2014, Plaintiff worked as a crew mechanic under Joseph Dobbins and James Hudson, though Dobbins was his primary supervisor. Finally, from November 2016 to his termination in July of 2018, Plaintiff worked primarily as a crew leader once he successfully completed the CLDP after his second time in the program. During this final portion of his tenure at WGLC, Plaintiff was supervised by Dennis Samuel, who himself reported to Kevin Gordon. It is unclear whether either Gordon or Samuel were aware that Plaintiff is biracial. At some point during his time under Samuel and Gordon, Gordon told Plaintiff that he needed to shave his face in order to comply with WGLC policy that requires field operations staff to be clean shaven so they can wear gas masks. Gordon also at one point showed pictures of Plaintiff's work vehicle to Plaintiff which showed the vehicle to be dirty. Plaintiff felt harassed by both of Gordon's actions as he did not feel respected.

Throughout the times relevant to this case, Plaintiff was a union member of the International Brotherhood of Teamsters,

Local 96 (the "Union"). There were two contracts between the Union and WGLC, both of which laid out the same five-step disciplinary action guidelines. The steps were: (1) a written reprimand, (2) a written reprimand and two-day suspension, (3) a written reprimand and five-day suspension, (4) a final warning of potential discharge and ten-day suspension, and (5) discharge. For every twelve months an employee went without receiving additional discipline, he would drop by one step on the progressive plan.

On June 28, 2013, Surdam issued Plaintiff a first-step written reprimand for repeated tardiness. WGLC records show that Plaintiff was late at least twelve times between February 2012 and June 2013. Employee discussion logbooks show that Plaintiff was counseled on a number of occasions about the importance of timeliness prior to receiving the written reprimand. Two other employees were also frequently late, but did not receive reprimands. The first, an African-American man, was given grace by Surdam because he was a single father and was frequently late due to caring for his young child and he called every time to explain the situation to Surdam. The second, a white man, was allegedly told by Surdam to enter the building from the rear to avoid detection of his consistent lateness; Surdam disputes that he gave such instructions.

Plaintiff stated that he spoke to Surdam on July 23, 2013 to discuss what he felt was unfair treatment and discrimination. It is unclear whether this discussion actually occurred, and, if it did, the exact date it happened.

On August 14, 2013, Plaintiff received a second-step disciplinary action of a written reprimand and two-day suspension for his involvement in a motor vehicle accident that occurred on July 17, 2013 while driving a WGLC vehicle that was deemed by the WGLC safety department to have been avoidable. Surdam was not part of WGLC's investigation into the accident.

Plaintiff had a meeting with Hudson and Surdam on September 24, 2013 in which Plaintiff complained about the treatment he had received from Surdam. No significant change in Plaintiff's treatment came from this meeting.

On September 25, 2013, Plaintiff received a third-step disciplinary action of written reprimand and five-day suspension from Surdam for not properly locating a water service line prior to digging and hitting said line. Plaintiff stated that no other employee had been punished for this type of accident. In fact, another employee previously hit a marked utility line and was not punished, though this individual did not report to Surdam. Surdam stated that Plaintiff was his only supervisee that had struck a water line or other utility. Plaintiff had received training from WGLC on how to locate utility lines prior to

digging. Surdam also stated that the timing of the disciplinary action was a result of when WGLC's safety department decided how it would proceed with the matter. Due to this third disciplinary action, Plaintiff was removed from the CLDP the first time causing a decrease in pay. Removal from the CLDP after a third-step disciplinary action was required by the Union contract in force at the time. During the October 4, 2013 meeting in which Plaintiff was informed of his removal from the CLDP, he complained to both Surdam and Dobbins about what he felt was discrimination and harassment from Surdam.

Plaintiff filed a grievance through the Union regarding the third-step disciplinary action. A meeting was held on May 6, 2014. At the meeting, Plaintiff complained that the discipline was issued by Surdam for discriminatory reasons. This disciplinary action was later reversed and Plaintiff received backpay in September 2014 after the grievance process was completed.

On November 20, 2013, Plaintiff received a fourth-step disciplinary action for his failure to timely disclose an incident where Plaintiff bumped a WGLC garage door with a work vehicle. The incident was filmed by a security camera nearby. Numerous employees had issues with the garage door and WGLC knew of the issue, but Plaintiff was the only employee known to WGLC to not timely report an incident where the garage door and a

vehicle made contact. Another employee, Jovan Torbic, stated that he did not report bumping into the garage door and did not receive any discipline for that failure to report. WGLC claims to not have had knowledge of Torbic hitting the garage door. Dobbins issued the discipline one month after becoming Plaintiff's supervisor and stated that Plaintiff was his only employee that he knew of that had an incident like this one. It is unclear if Plaintiff did in fact tell Dobbins about the incident prior to it being recorded and his receiving discipline, as well as whether Dobbins told him he did not need to report the incident. It is also unclear whether Dobbins knew Plaintiff was biracial or assumed he was solely African-American.

On his end-of-year employee performance appraisal from Surdam and the 2014 mid-year appraisal from Dobbins, Plaintiff received the second highest rating available in the "meeting requirements" category. The appraisals each had both positive and constructive comments regarding Plaintiff. Plaintiff found these reviews to be harsh.

On March 28, 2014 Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"). WGLC received notification of the charge on March 31, 2014. The EEOC opened an investigation and continued to examine evidence until issuing a

probable cause determination on April 20, 2018. The EEOC then provided Plaintiff with a Right-to-Sue letter on May 9, 2018.

Plaintiff then went a number of years without receiving further discipline and dropped down to the first step of the disciplinary plan.

Between August and November of 2016, Plaintiff stated that his name was placed on a list for overtime work lower than it should have been, which resulted in him not being selected for the over time hours. Instead, a white employee was selected over Plaintiff in violation of the Union contract. Similarly, Plaintiff was not selected for holiday work scheduling between November 2016 and January 2017 and other white workers were selected in violation of the Union contract. It is unknown who made the scheduling and selection decisions in these instances or why the errors were made.

Plaintiff met with Samuel in November of 2016 to discuss how Plaintiff felt disrespected by Samuel. Plaintiff requested a second meeting in December to discuss the same issue and that time Gordon was present. Much of the disrespect Plaintiff felt was due to the fact that Samuel required Plaintiff to have certain staffing decisions approved, whereas other employees in Plaintiff's same position but outside his protected class did not. Samuel got angry at both meetings held by Plaintiff, and at

the second, left quickly stating that another meeting might cause him to "act out."

Plaintiff received a second-step disciplinary action on August 16, 2017 from Samuel because he failed to go directly to the site of an emergency gas leak that he had been assigned to cover on August 2, 2017. It was WGLC policy that employees must respond immediately to gas leaks when assigned due to the exceptional hazard they pose. Plaintiff stopped for food on his way to the site. Plaintiff stated that a white employee, Roy Perry, engaged in similar conduct without receiving discipline. Perry was a leak survey mechanic at the time of his incident and was not trained or qualified to repair gas leaks. Plaintiff also stated that he complained to Samuel about harassment and discrimination during the investigation of this incident, and he complained again when he received the final discipline decision.

On August 18, 2017 Plaintiff met with a senior specialist in labor relations for WGLC, Mike Adams, to complain about the harassment and discrimination he felt he suffered at the hands of Samuel and Gordon. Plaintiff again complained during a grievance meeting on September 18, 2017.

Plaintiff filed his second EEOC charge against WGLC on June 6, 2018. Plaintiff stated that he informed WGLC's Human Resources Department, Samuel, and Gordon of the charge on June 7, 2018, though neither Samuel or Gordon recall when they

learned of the second EEOC charge. Plaintiff later said he did not remember the exact date he informed Samuel. WGLC received official notification of the charge from the EEOC on July 9, 2018.

On July 3, 2018, Plaintiff received a third-step disciplinary action from Samuel for failure to properly follow a WGLC policy in regards to receiving supervisory approval to take paid time off. Plaintiff's requested time off was initially denied by the company scheduler, but Plaintiff found another employee, Sawyer, to work his shift. It is unclear if Plaintiff received verbal approval from a supervisor, Joe Keeney, prior to the incident. It is also unclear if Samuel knew about Plaintiff's filing of the second EEOC charge when Samuel reported the incident but Plaintiff stated that he remembered telling Samuel about the charge.

That same day, Plaintiff received a fourth-step disciplinary action due to his accrual of driving points. Plaintiff ran a red light on June 20, 2018 while in a WGLC vehicle and braked hard while crossing the intersection to avoid hitting two other vehicles. This incident increased his driving points to six, and the Union contract stated that an employee with more than five points would be subject to progressive discipline. The incident was recorded by a video recording

device onboard the WGLC vehicle which was triggered by Plaintiff's abrupt braking.

WGLC terminated Plaintiff as his fifth-step disciplinary action on July 24, 2018. This action was taken because it was discovered that Plaintiff had disconnected the video recording device in the WGLC vehicles he drove on sixteen occasions in May and June of 2018 in violation of WGLC policy. A WGLC senior labor relations specialist, Coby Turner, began investigating whether employees were disconnecting the recording devices prior to being told by Plaintiff that Plaintiff had filed the second EEOC charge. Plaintiff was the first to receive disciplinary action for disconnecting the devices, but WGLC subsequently disciplined a number of other employees for the same misconduct.

These final three disciplinary actions from July 3, 2018are currently being dealt with through the Union grievance process.

Plaintiff brought this lawsuit alleging five counts: Race Discrimination under Title VII (Count I); Color Discrimination under Title VII (Count II); Retaliation under Title VII (Count III); Race Discrimination and Hostile Work Environment under 42 U.S.C. § 1981 (Count IV); and Retaliation under 42 U.S.C. § 1981 (Count V). This Court denied Defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on February 19, 2019. Discovery in this case is now closed and Defendants have moved for summary judgment.

Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in [his] favor without weighing the evidence or assessing the witness' credibility." Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002). Summary judgment may be entered when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" to find an issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

In cases involving employment discrimination under Title VII, there is a three-step burden shifting scheme. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). First, absent direct evidence of discrimination, a plaintiff must demonstrate a prima facie case of discrimination by a preponderance of the evidence. Id. A prima facie case of discrimination requires a plaintiff to prove (1) membership in a protected class; (2) an adverse employment action was taken

11

against him; (3) his job performance met his employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances raising an inference of unlawful discrimination. See Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 558 (4th Cir. 2011). The elements of a prima facie case of retaliation are (1) the plaintiff engaged in a protected activity; (2) the defendant took an employment action against him that a reasonable employee would have found materially adverse; and (3) there was a causal connection between the protected activity and the adverse employment action. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67-70 (2006). The standards for evaluating a prima facie case under Section 1981 are similar to those under Title VII, however, there are additional requirements that the defendant be causally linked to discriminatory action and the claim be predicated on the individual's personal involvement. See Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543 (4th Cir. 2003) (applying the McDonnel Douglas framework to Section 1981 claims); Hawthorne v. Va. State Univ., 568 Fed. Appx. 203, 204-05 (4th Cir. 2014) (noting the individual involvement requirement).

Upon demonstration of a prima facie case, the burden shifts to the defendant to "'produc[e] evidence' that the adverse employment actions were taken 'for a legitimate,

nondiscriminatory reason.'" St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)). The resulting burden on the defendant is one of production only, not of persuasion. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). If the defendant is able to produce such evidence, the burden reverts back to the plaintiff to prove that the articulated reasons are merely pretext for actual discrimination. Id. at 143 (quoting Burdine, 450 U.S. at 253). A legitimate, non-discriminatory reason may only be found to be pretextual if a plaintiff demonstrates that the reason is false and the defendant engaged in intentional discrimination or retaliation. Id. at 146-47. "Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered." Id. at 148-49.

To begin, Plaintiff claims to have been discriminated against because of both his race and his color. The parties do not dispute that Plaintiff is a member of a protected class as a light-skinned biracial man. Other than the first-step written reprimand from June 28, 2013 and the non-selection for overtime

13

and holiday shifts, the parties also do not dispute that the disciplinary actions Plaintiff received were adverse actions for purposes of putting forth a prima facie case.

To be an adverse action, the discipline an employee receives must negatively affect the terms and conditions of their employment. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Typically, an action is adverse if it results in a reduction in pay, demotion in position, termination, or other similarly serious change in employment status. Id.; Lettieri v. Equant Inc., 478 F.3d 640, 650 n. 2 (4th Cir. 2007) (noting that Burlington Northern expanded the adverse action standard to include injuries and harms beyond strict terms and conditions of employment). Defendants contend that the first-step written reprimand was not an adverse action as it did not affect Plaintiff's pay or status in any way and would be removed from his record if he went twelve months without receiving any further discipline. Plaintiff correctly noted, though miscited, that a written reprimand without more may not ordinarily be an adverse action, but if it is a "signpost[] on a predetermined path to a true adverse employment action" it may be considered such. Adams v. Anne Arundel County Public Schools, 789 F.3d 422, 429 (4th Cir. 2015). In the instant case, the Union contract provides for a progressive discipline plan and the written reprimand moves an employee further up the steps, i.e. allowing

further, more severe action to be taken, thus, in this instance it may be considered an adverse action. In regards to the non-selection for overtime and holiday scheduling, both clearly affected Plaintiff's pay and thus may be considered adverse actions for purposes of a prima facie case.

There is some contention over whether Plaintiff was meeting his employer's legitimate expectations when he received the disciplinary actions from WGLC. Plaintiff points to the fact that he was consistently receiving the second highest marks possible on his performance evaluations. Defendants note that each disciplinary action taken was in response to a violation of WGLC policy and that a violation of policy inherently means that Plaintiff was not meeting expectations. At this stage, the Court must resolve all facts in favor of the nonmovant, in this case Plaintiff, and will, solely for purposes of determining whether a prima facie case exists, move forward with the understanding that Plaintiff was meeting WGLC's expectations other than the specific policy violations.

Plaintiff also alleges, and some testimonial evidence shows, that a number of his supervisors made racist comments generally, though it is unclear whether the comments were directed at Plaintiff. The same testimonies discuss that Plaintiff's co-workers felt that he was frequently treated more harshly, though it is unclear if he was treated more harshly

than all other employees or only those outside his protected class. Thus, for purposes of this motion, and in order to resolve any disputed facts in Plaintiff's favor, the Court will note that there could be an inference of discriminatory intent behind the disciplinary action taken by WGLC.

As Plaintiff has provided evidence to support a prima facie case of discrimination, the burden now shifts to Defendants to produce a legitimate, nondiscriminatory reason for their actions. Reeves, 530 U.S. at 142. Defendants contend that each step of discipline that Plaintiff received was a result of his violating a WGLC policy. Defendants have not wavered in their explanations of the disciplinary actions taken, which is probative of the absence of pretext. Holland v. Washington Homes, Inc., 487 F.3d 208, 222 (4th Cir. 2007) (stating conversely that inconsistent explanations are probative of pretext). Plaintiff, however, raised numerous objections to the reasons Defendants produced, but, as discussed below, continually focused their arguments on the existence of a prima facie case of discrimination as opposed to rebutting the legitimate reasons as required by the McDonnell Douglas burden shifting scheme. 411 U.S. at 802-04.

To begin, WGLC proffered that it legitimately issued the first step written reprimand to Plaintiff on June 28, 2013 for excessive tardiness after Plaintiff was late to work at least

twelve times and received verbal counseling on the importance of timeliness six times. Plaintiff admitted that he received such counseling. Plaintiff contends that this proffered reason is pretextual because Surdam did not issue written reprimands to two other individuals that were consistently late, one of whom was African-American and one of whom was white. In deposition testimony, Surdam stated that he did not discipline the African-American employee because he was a single father that ran late caring for his child and called every time to alert Surdam to the circumstances. WGLC did not respond regarding the white employee. Plaintiff also attempts to say that the history of negative comments Surdam directed his way gives rise to an inference of pretext, but that misapplies the McDonnell Douglas standard. Plaintiff may rely on inferences of discrimination when attempting to set out a prima facie case, but must come forward with more concrete evidence when rebutting a legitimate, nondiscriminatory reason proffered by WGLC. Reeves, 530 U.S. at 146-47. Plaintiff has not born his burden to prove that WGLC's reason for issuing the discipline was pretextual and that discrimination actually occurred in the issuance of this written reprimand. Id.

The second-step disciplinary action received by Plaintiff on August 14, 2013 was due to his causing an accident that was deemed avoidable. WGLC proffered that the company's safety

department investigated the incident and made the determination that Plaintiff was at fault and could have avoided the collision; also, the collision raised the number of Plaintiff's driving points above the level allowable by the Union contract. WGLC also stated that Surdam was not part of the investigation. Plaintiff again tries to lay out a prima facie case for discrimination by stating that Surdam did not want him in the CLDP and that is why he was disciplined, but this does not respond to the fact that Surdam had no say in the outcome of the investigation that led to the disciplinary action Plaintiff received in this instance or show that WGLC's safety department acted discriminatorily when investigating the incident.

The third-step disciplinary action taken against Plaintiff on September 25, 2013 was for Plaintiff failing to locate an unmarked water service line prior to digging and striking the line. Plaintiff contends that this is pretextual because no other employee had been disciplined for striking a utility line, and some even struck lines that were properly marked. Additionally, Plaintiff notes that this disciplinary action was removed from his record after the Union grievance process was completed. The record, however, shows that Plaintiff was the only employee that reported to Surdam that struck a utility line and thus all the other employees are not proper comparators. Haywood v. Locke, 387 Fed. Appx. 355, 359 (4th Cir. 2010)

(comparators must have "dealt with the same supervisor, [been] subject to the same standards and . . . engaged in the same conduct") (internal quotations omitted). Further, later reversal of a disciplinary action cannot be used, without more, to demonstrate pretext as the question is whether the Defendant believed the facts underpinning the disciplinary action to be true at the time the action was taken. Collins v. Baltimore City Bd. of Sch. Comm'rs, 528 Fed. Appx. 269, 273 (4th Cir. 2013) (internal citations omitted). This is because "[p]retext is a lie, not merely a mistake." Id. (quoting Jordan v. Summers, 205 F.3d 337, 344 (7th Cir. 2000)).

Plaintiff further raises issue with Defendants' proffered reasons for the issuance of the fourth-step discipline that was issued on November 20, 2013 after Plaintiff failed to timely report that he struck a garage door with a company vehicle. Plaintiff says that he should not have received punishment for something that was a problem known to WGLC and that he was the only employee to receive such discipline. Plaintiff specifically raises the fact that Torbic bumped into the garage door and did not report it, but received no discipline. These contentions, however, do not demonstrate racial animus in the issuance of the discipline. First, the disciplinary action was taken not merely because Plaintiff bumped into the garage, but because he failed to report the incident in a timely manner per WGLC policy.

WGLC's knowledge of the defect with the door would not relieve Plaintiff of his duty to report the incident. Second, there is no evidence on the record that WGLC ever learned of Torbic's failure to report prior to this case, thus, he cannot be said to be a true comparator. <u>Haywood</u>, 387 Fed. Appx. at 359 (a proper comparator will have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.") (internal quotations omitted). Plaintiff also attempts to challenge whether Plaintiff actually reported the incident earlier than what is recorded in the logbooks and whether his supervisor, Dobbins, told him he did not need to report the incident. This goes more to whether there is an inference of discrimination that can be made, i.e. whether a prima facie cases exists. Again, at this point, Plaintiff must provide more than mere inference to successfully defeat summary judgment.

Next, Defendants stated that Samuel issued the July 3, 2018 third-step disciplinary action because Plaintiff failed to comply with WGLC's paid time off policy. Plaintiff asserts that this is mere pretext because Keeney told Plaintiff he could take the time if he found a replacement for his shift, Keeney was present when Sawyer agreed to take the shift, and Samuel knew about these events after the missed shift but before disciplining Plaintiff. Plaintiff also states that Sawyer

received no discipline for these events. Again, much of this leads only to a potential inference of discrimination, not that it actually occurred as is required at the third stage of the McDonnell Douglas scheme. Missing from Plaintiff's assertions are facts that show Keeney's approval of the shift-swap was sufficient to satisfy the WGLC policy, or that Plaintiff didn't need to further alert Samuel to what was going on. Further, there is no evidence that other employees who engaged in similar activity were not disciplined for it. Plaintiff, yet again, has not surpassed the setting out of a prima facie case and borne his burden of demonstrating pretext and actual discrimination.

Plaintiff did not directly address the legitimate, nondiscriminatory reasons produced by Defendants as to the other disciplinary actions he received, thus, he has not met his burden to prove they are pretextual.

Turning to the allegations of retaliation, Plaintiff attempts to raise issues of material fact regarding when certain conversations allegedly occurred. These conversations would have included complaints by Plaintiff of alleged harassment and discrimination, or in some cases informing a supervisor that Plaintiff had filed an EEOC charge. The existence and timing of these conversations go to whether Plaintiff has made a prima facie case of retaliation by showing temporal proximity of the conversation, i.e. protected activity, and the adverse

21

employment action taken against him. Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001). Assuming that the conversations occurred when Plaintiff believes they did and included discussions which would constitute protected activity, Plaintiff will have merely succeeded in setting forth a prima facie case of retaliation. Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994). At this point, again, Plaintiff must do more to rebut the legitimate, nondiscriminatory reasons proffered by Defendants for the actions taken. Reeves, 530 U.S. at 146-47.

Plaintiff begins by contending that Samuel and WGLC retaliated against him by issuing the second-step discipline to him on August 16, 2017. This discipline was issued in response to Plaintiff's failure to promptly respond to a gas leak on August 2, 2017. Plaintiff initially stated in his response to interrogatories that he had a conversation with Samuel discussing how he felt harassed and discriminated against by Samuel. Plaintiff initially stated that discussion was had on August 18, 2017, two days after the discipline was issued, but amended his responses to say that the conversation happened on August 7, 2017. While this raises a question of when the conversation actually occurred and whether there would be protected activity in temporal proximity to the issuance of the discipline, it is of little import as the incident that was the basis for the discipline occurred on August 2, 2017, prior to

any conversation between Plaintiff and Samuel regarding discrimination. Thus, Plaintiff has not demonstrated that the reason for and timing of the discipline issued by WGLC was pretextual.

Plaintiff next contends that the third and fourth step disciplinary actions he received on July 3, 2018, breaking of the paid time off policy and running a red light, respectively, came very shortly after Defendants were informed by Plaintiff of his second EEOC charge. Plaintiff initially claimed that he spoke to Samuel and Gordon on either June 6 or June 7, 2018 about the second EEOC charge. Plaintiff later stated that he did not remember telling Samuel about the charge on June 7, 2017. This does not create a material issue of fact for two reasons. First, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984). Second, the timing of this conversation is unimportant at this stage as it would merely go to show whether a prima facie case existed. At this stage, Defendants have proffered legitimate, nondiscriminatory reasons for when and why these two disciplinary actions were taken and Plaintiff must rebut them with evidence of pretext and actual retaliation. Reeves, 530 U.S. at 146-47. Plaintiff has failed to show why the timing of

these disciplinary actions is anything more than unfortunate, let alone retaliatory.

Lastly, Plaintiff claims that his termination on July 24, 2018, the fifth step disciplinary action, was due to retaliation because it came mere weeks after WGLC was officially informed of Plaintiff's second EEOC charge. WGLC responded by noting that its employee, Coby Turner, began investigating whether Plaintiff was unplugging the camera in the WGLC vehicles that he drove before learning of the EEOC charge. In fact, Plaintiff admitted to telling Turner about the EEOC charge when he learned that Turner was investigating him. As the investigation began before WGLC learned of the EEOC charge, the temporal proximity required for a retaliation claim is not present. Breeden, 532 U.S. at 273 (noting that in cases using temporal proximity the retaliatory conduct must come "very close" after the protected activity).

Plaintiff further argues that he was the only employee initially punished for unplugging his camera and that other employees were only disciplined months later when Plaintiff filed a Union grievance in order to remove any appearance of arbitrariness or discrimination. The only evidence Plaintiff puts forth in support of this contention, however, is his own statement from his deposition where he notes that a Union employee told him there was evidence of other employees that had turned off the cameras in their vehicles and they had not been

disciplined. This uncorroborated, and by Plaintiff's admission, unable to be corroborated, self-serving statement is not enough to survive summary judgment. Mackey v. Shalala, 360 F.3d 463, 469-70 (4th Cir. 2004) (finding that "[a] plaintiff's own self-serving opinions, absent anything more" are insufficient to overcome summary judgment); Williams v. Giant Food Inc., 370 F.3d 423, 433 (4th Cir. 2004) (stating that "a self-serving opinion ... cannot, absent objective corroboration, defeat summary judgment"). Without more than mere speculation and inference, Plaintiff cannot demonstrate that Defendants' legitimate reason for this discipline is false or that actual retaliation occurred.

In a final attempt to raise issues of material fact in regards to the discrimination and retaliation claims, Plaintiff contends that WGLC did not thoroughly investigate the claims Plaintiff made to it. If true, this could be a basis for a harassment claim. Friend v. Leidinger, 588 F.2d 61, 67 (4th Cir. 1978). The record shows, however, that WGLC repeatedly asked Plaintiff to make statements in support of his complaints and he repeatedly ignored or denied those requests. In one instance, Plaintiff even withdrew the complaint from the human resources department and stated that he had taken the matter up with a higher office. Even if Plaintiff was correct that WGLC failed to adequately investigate his complaints, it would, again, be

merely enough to raise an inference of discrimination, not rebut proffered legitimate reasons for employment actions WGLC took. Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 212-13 (4th Cir. 2014) (finding that an employer's failure to investigate claims of harassment must implicate the proffered legitimate reason for adverse action to be evidence of pretext).

Lastly, Plaintiff claims to have suffered from the creation of a hostile work environment. Plaintiff points to harsh treatment by Surdam and a comment Surdam made about how he does not like "half-breeds" while ostensibly discussing canines. Surdam also made numerous comments about how he did not believe Plaintiff should have been part of the CLDP in 2013, though none included explicit racial remarks, and yelled at Plaintiff to keep his safety glasses on. Plaintiff also points to harsh treatment by Dobbins and a comment he made a bout a "black man standing" which Dobbins later apologized for. Plaintiff lastly points to a time when he was shown a photograph of his WGLC vehicle in a state of dirtiness and how he was asked to shave.

A prima facie claim for creation of a hostile work environment requires a plaintiff to show (1) unwelcome harassment, (2) the harassment is based on race or color or is in retaliation for protected conduct, (3) the harassment is sufficiently severe or pervasive, and (4) a basis for imposition of liability on the employer. See Baqir v. Principi, 434 F.3d

733, 745-46 (4th Cir.), cert. denied, 549 U.S. 1051 (2006).

Race, color, or retaliation must be the "but for" cause of the

harassment experienced by a plaintiff. Causey v. Balog, 162 F.3d

795, 801-02 (4th Cir. 1998). To determine the severity and

pervasiveness of the alleged harassment, a court must consider

the totality of the circumstances, which "may include the

frequency of the discriminatory conduct; its severity; whether

it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an

employee's work performance." Harris v. Forklift Sys., Inc., 510

U.S. 17, 23 (1993).

Upon review of the incidences which Plaintiff claims

demonstrate he was harassed, he is unable to show that race,

color, or retaliation were the "but for" cause of the treatment

he endured. As an example, Plaintiff's supervisor may have

yelled at him to keep his safety glasses on simply to ensure

that he was not struck in the eye with an object. In fact, this

is what Surdam testified was the motivating reason for why he

told Plaintiff to put his glasses back on. Additionally, the

totality of the circumstances does not evince the requisite

severity or pervasiveness. The comments and harshness Plaintiff

complains of do not appear to have been racially tinged beyond

two occasions from different supervisors over nearly five years,

and mere occasional utterances will not suffice. Harris, 510

U.S. at 23. Also, while Plaintiff may have been humiliated by having his inadequate work product photographed and shown to him, this does not rise to the level of humiliation the law is meant to curtail and is not based on his race, nor did it interfere with his work performance in an unreasonable manner. Id. In fact, both the instance with the photograph and his being told to shave were attempts to bring Plaintiff in line with WGLC policies. Plaintiff has failed to show that he was forced to endure a hostile work environment and these claims fail.

Counts IV and V are Section 1981 claims against Samuel and Gordon individually. The parties dispute whether Samuel and Gordon had sufficient authority to issue discipline on their own such that suit could be brought against them individually. Hawthorne, 568 Fed. Appx. at 204-05. The Court, however, does not need to address this matter as it has already found that Plaintiff did not sufficiently rebut Defendants' proffered legitimate, nondiscriminatory reasons for the disciplinary actions causing Plaintiff's Title VII claims to fail and the standards are the same for Section 1981. Bryant, 333 F.3d at 543.

For the reasons mentioned, the Court concludes that summary judgment in favor of Defendants is warranted and Defendants' motion will be granted. An appropriate order shall issue.

_Claude M. Hilton_
CLAUDE M. HILTON
UNITED STATES DISTRICT JUDGE

Alexandria, Virginia
~~August ___, 2019~~
Sept. 9, 2019